## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| REBECCA L. PLUTH, | ) | CASE NO. 8:09CV126 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM |
| | ) | AND ORDER |
| MICHAEL J. ASTRUE, as | ) | |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on the denial, initially and on reconsideration, of the Plaintiff's application for supplemental security income ("SSI") benefits based on disability under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq*.  The Court has carefully considered the record (Filing No. 11) and the parties' briefs (Filing Nos. 17 and 23).

## PROCEDURAL BACKGROUND

The Plaintiff, Rebecca L. Pluth, filed her application for SSI benefits on April 28, 2006.[1]  (Tr. 96-101).  Her application was denied initially (Tr. 66, 77-80) and on reconsideration. (Tr. 65, 72-75).  Pluth requested a review and a hearing before an administrative law judge ("ALJ").  (Tr. 71).  Pluth appeared with her non-attorney representative at a hearing before ALJ, Jan E. Dutton, on July 16, 2008. (Tr. 633-78).  On October 31, 2008, the ALJ issued her written opinion that Pluth has not been under a disability since the amended alleged onset date of disability, August 31, 2005.  (Tr. 39-50).

---

[1]Pluth previously applied for SSI on August 31, 2005. (Tr. 102-07). That application was denied initially (Tr. 68, 86-89) and on reconsideration (Tr. 67, 81-84) and was not appealed.

On March 16, 2009, the Appeals Council denied Pluth's request for review.  (Tr. 4-6).  Therefore, the ALJ's decision constitutes the Commissioner's final decision subject to judicial review.

### FACTUAL BACKGROUND

Pluth initially alleged a disability that began on April 15, 2005[2] as a result of a herniated disc in her back, and stomach pains. (Tr. 139-40).  Pluth was born June 25, 1980, and was 28 years old on the date of the hearing before the ALJ.  (Tr. 640).

***Medical Evidence***

After experiencing left-side lower back pain and leg numbness for approximately two months, Pluth underwent an MRI on June 17, 2005.  (Tr. 422).  The MRI revealed a "large focal midline disc protrusion at L5-S1 with moderate ligamentous and facet joint hypertrophy causing moderate to severe bilateral neural foraminal stenosis, right worse than left, and mild anterior thecal sac indentation." (Tr. 423).

Pluth had her first back surgery on September 1, 2005.  The procedure, a laminotomy with undercutting facecomy at L4-5 and L5-SI and resection of two large disc fragments, was performed by Dr. John McClellan, M.D., of the Nebraska Spine Center. (Tr. 338).  There were no complications and Pluth was discharged from the hospital on September 2, 2005.  (Tr. 338).

Dr. McClellan saw Pluth for a post-operative followup visit on October 10, 2005.  (Tr. 514-15).  The record from this visit is somewhat inconsistent, stating both that "[t]he patient is doing well with no complaints of pain" and then indicating that the patient complained of

---

[2]The ALJ noted that Pluth amended her onset date to August 31, 2005.  (Tr. 39).

2

lower back pain characterized as an 8 on a 10-point scale.  (Tr. 514).  The notes from the visit  indicate that Dr. McClellan recommended that Pluth participate in a short course of physical therapy and resume taking an anti-inflammatory medication.  (Tr. 515).  Dr. McClellan and Pluth also discussed the need for her to stop smoking.  (Tr. 515-16).  Dr. McClellan provided Pluth with a prescription for physical therapy for sciatic mobilization and the development of a home exercise program.  (Tr. 517).  She was instructed to return to the Nebraska Spine Center for a follow-up visit in three months.[3]  (Tr. 516).

Pluth saw Dr. Wenzl on January 6, 2006, complaining of lower back pain.  (Tr. 478).  She indicated that she had increased feeling in her lower extremities and fewer leg cramps.  (Tr. 478).  Upon examination, Dr. Wenzl noted that Pluth's gait was normal, but that she exhibited tenderness in the lower lumbar area and a decreased range of motion.  (Tr. 478).  Dr. Wenzl extended Pluth's physical therapy for an additional six weeks.  (Tr. 478).

On January 17, 2006, Dr. Wenzl signed a form indicating that Pluth's chronic low back pain limited her daily activities and her ability to work.  (Tr. 480).  He further identified the following restrictions on her physical activity: no prolonged sitting or standing, no bending kneeling, stooping or lifting more than ten pounds.  (Tr. 480).

Pluth saw Dr. Wenzl on March 30, 2006, complaining of both lower back and neck pain.  (Tr. 478).  Upon examination, Dr. Wenzl noted that while Pluth had tenderness in the lumbar area, she had negative straight leg raises, was able to stand on one foot at a time, stand on her tiptoes, walk on her heels, and showed a good range of motion.  (Tr. 478).

---

[3]It appears that Pluth did not consult again with Dr. McClellan until August 2, 2006, when he reviewed an MRI scan with her.  (Tr. 555).

3

He refilled her pain medication, made changes in other medications, and ordered further physical therapy.  (Tr. 478).

On July 24, 2006, Pluth saw Dr. Wenzel complaining of increased back pain and the ineffectiveness of her pain medication.  (Tr. 474).  She reported that she was seen in the emergency room the previous day and received an injection to treat the severe pain.  (Tr. 474).  Upon examination, Dr. Wenzl noted a decreased range of motion and tenderness.  (Tr. 474).  Dr. Wenzl further noted that Pluth exhibited normal strength in her upper extremities, normal deep tendon reflexes, normal straight leg raising, and slow, yet normal gait.  (Tr. 474).  Dr. Wenzl increased Pluth's dosage for pain medication and opined that her medication may need to be further increased.  (Tr. 474).

August 2, 2006, Dr. McClellan (Tr. 555) reviewed the results of a lumbar MRI with Pluth.  (Tr. 555).  He indicated the need for a discogram before further exploring surgical options.  (Tr. 555).  The lumbar discogram was performed on January 11, 2007 (Tr. 550-51) and Dr. McClellan discussed the results with Pluth on January 31, 2007.  (Tr. 548-49).  He recommended fusion of L5-S1, but recommended that she quit smoking prior to any surgery.  (Tr. 549).

On October 14, 2007, Pluth was seen in the Emergency Room of St. Mary's community Hospital complaining of severe left leg and buttocks pain after having jumped down from a wall.[4]  (Tr. 572).  The ER physician noted that Pluth reported tenderness and pain with straight leg raises on the left, though not severe, and no pain on the right side.

---

[4]The additional evidence submitted to the Appeals Council included a statement from Pluth explaining that she did not intentionally jump down from a wall but rather fell off a ledge when she was attempting to get out of the way of a truck being unloaded.  (Tr. 29).

4

(Tr. 572).  Pluth was given Stadol and Vistaril for pain management and advised to follow up with her primary care physician.  (Tr. 572)

On November 14, 2007, Pluth saw Dr. McClellan complaining of severe pain in her left leg.  (Tr. 545).   Upon examination, he noted "very positive straight leg raise at 10 degrees on the left" and ordered lumbar MRI studies.  (Tr. 545).  On November 19, 2007, Dr. McClellan reviewed the results of the MRI with Pluth and recommended fusion at the L5-S1 level. (Tr. 544).

On February 13, 2008, Pluth arrived at the Emergency Room at St. Mary's Community Hospital reporting severe pain in her left leg, buttocks and lower back.  (Tr. 561).  The severity of her pain precluded special testing of the back.  Pluth received an injection of Stadol and was instructed to follow up with Dr. Wenzl the following day.

On February 14, 2008, Dr. Wenzl admitted Pluth to the hospital for pain management (Tr. 545, 619-20).  On February 19, 2008, Dr. McClellan performed a lumbar fusion (Tr. 537-38, 609-610).  Dr. McClellan reported no complications with the surgery and Pluth was discharged from the hospital on February 24, 2008.  (Tr. 537-38, 609-10).

On March 26, 2008, Dr. McClellan saw Pluth for her five-week post-operative visit.  (Tr. 534-536).  Pluth reported an improvement in her left leg pain, but reported low back pain, characterizing its intensity as an 8 on a scale of 1 to 10.  (Tr. 534).  Dr. McClellan noted that Pluth had "mild giveway weakness in the entire left lower extremity" but also noted that the "fusion appears to be consolidating well."  (Tr. 535).  He recommended that she participate in physical therapy in approximately one month.  (Tr. 535).  Pluth was

further instructed to return to see Dr. McClellan in ten weeks, however she cancelled her April 24, 2008, appointment and did not reschedule.[5]  (Tr. 535, 533).

On the following day, March 27, 2008, Pluth saw Dr. Wenzl for pain management, complaining of significant low back pain.  (Tr. 594).  Dr. Wenzl noted that Pluth was "somewhat noncompliant with the use of her brace."  (Tr. 594).  Upon examination, Dr. Wenzl noted that while Pluth exhibited some tenderness in the lumbar spine area, he observed negative straight leg raise, equal strength in lower extremities, and normal gait. (Tr. 594).  The medical notes from that visit further indicate that Pluth told Dr. Wenzl that she ran out of her OxyContin four days earlier and had increased pain since that time.  (Tr. 594).  Dr. Wenzl provided her with a refill of her prescription pain medication.  (Tr. 594)

On May 29, 2008, Pluth returned to Dr. Wenzl complaining of continued back pain, vomiting and sinus drainage.  (Tr. 593).  Upon examination, Dr. Wenzl noted continued tenderness in the lumbar spine area, positive straight leg raise, and antalgic gait.  (Tr. 594). Dr. Wenzl refilled Pluth's prescription pain medication. (Tr. 593).

On June 27, 2008, Dr. Wenzl, completed a Medical questionnaire regarding restrictions on Pluth's ability to work.  (Tr. 628-29).  He indicated that Pluth would occasionally need unscheduled rest periods during the day to lie down and relieve symptoms and that her ability to maintain sustained attention and concentration occasionally would be compromised as a result of her pain or fatigue and the side effects from her medication.  (Tr. 629).  Dr. Wenzl also opined that Pluth's symptoms would likely

---

[5]The records indicate that Pluth did not return to see Dr. McClellan until July 23, 2008, 17 weeks after her March 25, 2008, post-operative visit.  (Tr. 632)

6

cause frequent and/or unpredictable absences from work and that she would need to change positions at will.  (Tr. 629).

On July 23, 2008, Dr. McClellan saw Pluth for a 30 minute consultation (Tr. 632). He noted that she was frustrated about being denied disability and her persistent back pain.  (Tr. 632).  She reported that she experienced pain when she sat for any length of time (Tr. 632).  Dr. McClellan noted that her lumbar fusion was well healed and opined that Pluth's back pain was a chronic condition and she should be off narcotic pain medication. (Tr. 632).  In response to Pluth's question as to whether her condition would prevent her from working, McClellan stated, "At this point with Rebecca's young age of 28 if disability is strictly dependent on the degenerative changes in the lumbar spine then I told Rebecca that in my opinion that is not a total disability condition."  (Tr. 632).  He further indicated that he would leave any determination as to the effect of stress, anxiety, job history and education on Pluth's employability up to Dr. Wenzl.  (Tr. 632).

The record also includes records of Pluth's visits to Benson Chiropractic Clinic covering the period from February 17, 2003, to July 20, 2006 (Tr. 382-95), and records from Community Rehab Physical Therapy & Sports Medicine where Pluth attended physical therapy.  (Tr. 359-81, 584-91).

### Pluth's Testimony

On July 16, 2008, Pluth testified at the administrative hearing before the ALJ.  (Tr. 640-670).  She testified with respect to her eighth grade education.  (Tr. 640-41).  She also testified that she is a single mother of two children ages ten and four, and that she has received ADC and medical care since her pregnancy with her oldest child.  (Tr. 641-42). She stated that she previously worked at fast food restaurants and then held a job as an

7

insert operator at First Data Resources for two years before being laid off.  (Tr. 644-47).
When asked why she has not held a steady job since that time, even when she was
healthy, Pluth responded that she had problems with childcare for her oldest son and
chose not to work, instead depending on ADC payments.  (Tr. 647).

      Pluth testified that she is disabled because her back continues to hurt even after her
surgeries.  (Tr. 655)  She rated the pain as an eight or nine on a ten-point scale on a bad
day (when she doesn't take medication because she needs to drive), and as a four or five
on a good day, if she has taken her medication.  (Tr. 655-56).  She stated that she takes
her medication every day. (Tr. 655).  She further testified that her back "really hurts really
bad" and described the pain as "pins and needles in my back."  (Tr. 655).

      Pluth further testified that her medications makes her sleepy and lightheaded, and
makes her sweat.  (Tr. 666).  She added that one of her medications caused blurred vision.
(Tr. 666).  She testified that because of those side effects, she is unable to drive when she
is taking her narcotic pain medication every four hours.  (Tr. 652).

      Pluth testified that she moved in with family members because she was unable to
take care of her children and her home on her own due to her back problems (Tr. 648).
Pluth testified that she spends most of her days lying down and that when she is not lying
down she is "just suffering . . . [and] dealing with [the pain]."  (Tr. 658)  She estimated that
she lies down about 12 hours of 24 hours and stated she lies down almost all the day and
is up and down at night. (Tr. 658)  Pluth testified that she cooks a little with her mother (Tr.
660) and has her 10-year-old son clean the house (Tr. 661).

      Pluth stated that she walks a little in the house but does not walk outside because
she cannot tolerate the heat and one of her medications could make her turn yellow in the

sun.  (Tr. 662, 664)  Pluth admitted that she doesn't exercise or do any back strengthening exercises because she doesn't know her limits and is afraid she might make her back worse.  (Tr. 661)  She added that she is waiting for an appointment with the Community Rehab Center in Plattsmouth (Tr. 661).

***Vocational Expert's Testimony***

The ALJ asked the vocational expert ("VE"), Michael McKeeman, to consider a hypothetical claimant of Pluth's age, education, and work experience, who was limited to lifting and carrying 20 pounds occasionally and 10 pounds frequently, and sitting, standing, and walking 6 hours each during an 8-hour workday.  The hypothetical claimant also would be able, occasionally, to perform all postural activities, climb, balance, stoop, kneel, crouch, and crawl, but should avoid work on ladders, ropes, scaffolds or dangerous equipment or machinery, and avoid exposure to cold, vibration or hazards such as dangerous equipment or machinery.  (Tr. 670).  The VE testified that the hypothetical claimant could return to work as a sandwich-maker as Pluth performed the job, not as defined in the Dictionary of Occupational Titles ("DOT").  (Tr. 670).  The VE further testified that the hypothetical claimant could return to work as a fast food worker and as an inserting machine operator as defined in the DOT.  (Tr. 670).  The VE also testified that the hypothetical claimant would be able to perform approximately 80 percent of the full range of unskilled, light work. (Tr. 670-71).  The ALJ then asked the VE to consider the first hypothetical with an additional limitation, requiring the claimant to change positions every 30 minutes to avoid pain and discomfort.  (Tr. 671).  The VE testified that the claimant probably could perform the sandwich-maker and fast-food-worker jobs, but not the inserting-machine-operator job.

9

He further testified that the hypothetical claimant would be "limited to a pretty wide range of unskilled, sedentary work, but there'd [sic] also be some light jobs."  (Tr. 672).

## THE ALJ'S DECISION

After following the sequential evaluation process set out in 20 C.F.R. § 416.920, the ALJ concluded that Pluth is not disabled.  (Tr. 50).  Specifically, at step one the ALJ found that Pluth has not engaged in substantial gainful work activity since August 31, 2005, the amended alleged onset date of disability.  (Tr. 41).  At step two, the ALJ found that Pluth has the following medically determinable "severe" impairments:  degenerative disk disease of the lumbar spine, status post L5-S1 discectomy on September 1, 2005, and fusion at L5-S1; and hernia repair.  (Tr. 41).  At step three, the ALJ found that Pluth's medically determined impairments, either singly or collectively, do not equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.925 and 416.926).  (Tr. 42).  At step four, the ALJ determined that, despite Pluth's medically determined impairments, she posseses the Residual Functional Capacity ("RFC") to:  lift and carry 20 pounds occasionally and 10 pounds frequently; sit, stand, and walk six hours in an eight-hour workday; occasionally climb, balance, stoop, kneel, crouch, and crawl; but is precluded from working on ladders, ropes, and scaffolds or dangerous equipment or machinery and must avoid concentrated exposure to cold and vibration.  (Tr. 43).  The ALJ found that Pluth is capable of performing three of her past jobs that do not require the performance of work-related activities precluded by her RFC.  (Tr. 49).  At the last step, the ALJ concluded that, in addition and in the alternative, Pluth could perform 80 percent of light, unskilled jobs as well as a significant number of sedentary, unskilled jobs and that such jobs exist in significant number in the state economy.  (Tr. 50).  Therefore, the ALJ

10

found that Pluth is not disabled and that she has not been under a disability since August 31, 2005, the amended alleged onset date of disability, through the date of the ALJ's decision.  (Tr. 50).

## STANDARD OF REVIEW

In reviewing a decision to deny disability benefits, a district court does not re-weigh evidence or the credibility of witnesses or revisit issues *de novo*.  *See Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).  Rather, the district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the ALJ's decision and, if so, to affirming that decision.  *Id.*

"Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the ALJ's determination."  *Id.* (citing *Sultan v. Barnhart*, 368 F.3d 857, 862 (8th Cir. 2004)).  The Court must consider evidence that supports the ALJ's decision, as well as evidence that detracts from the ALJ's decision.  *Id.*  As long as substantial evidence on the record as a whole supports the ALJ's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion.  *Stormo v. Barnhart,* 377 F.3d 801, 805 (8th Cir. 2004).

## DISCUSSION

Pluth claims that the ALJ's decision was incorrect because: 1) the ALJ's credibility assessment was unfair, inappropriate and unsupported by substantial evidence; 2) the ALJ improperly weighed the medical evidence of record; 3) the ALJ's formulation of Pluth's RFC was unsupported by substantial evidence; and 4) the ALJ submitted an inaccurate hypothetical to the VE and then relied on the VE's testimony (Filing No. 17, at 10, 12, 16

11

and 18).   Pluth further claims that the Appeals Council failed to consider evidence

submitted after the ALJ's decision.  (Filing No. 17, at 8).

**Plaintiff's Credibility**

The ALJ found that "While [she] does not doubt that [Pluth] experiences some

discomfort, the allegations of limitations and a pain level that precludes all types of work

are inconsistent with the objective medical evidence and the evidence as a whole."  (Tr.

47).  Pluth argues that the ALJ's assessment of her credibility is unfair, inappropriate, and

unsupported by substantial evidence.  (Filing No. 17 at 14).

The *Polaski* standard is the guide for credibility determinations:

> While the claimant has the burden of proving that the disability results
> from a medically determinable physical or mental impairment, direct medical
> evidence of the cause and effect relationship between the impairment and
> the degree of claimant's subjective complaints need not be produced. The
> adjudicator may not disregard a claimant's subjective complaints solely
> because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree
> of severity of subjective complaints alleged is just one factor to be
> considered in evaluating the credibility of the testimony and complaints. The
> adjudicator must give full consideration to all of the evidence presented
> relating to subjective complaints, including the claimant's prior work record,
> and observations by third parties and treating and examining physicians
> relating to such matters as:
>
> 1. the claimant's daily activities;
> 2. the duration, frequency and intensity of the pain;
> 3. precipitating and aggravating factors;
> 4. dosage, effectiveness and side effects of medication;
> 5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective
> complaints *solely* on the basis of personal observations. Subjective
> complaints may be discounted if there are inconsistencies in the evidence as
> a whole.

12

*Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1986). An ALJ is required to make an "express credibility determination" when discrediting a social security claimant's subjective complaints. *Lowe v. Apfel,* 226 F.3d 969, 971-72 (8th Cir. 2000). The ALJ, however, is "not required to discuss methodically each *Polaski* consideration." *Id.* at 972.

Deference is generally granted to an ALJ's determination regarding the credibility of a claimant's testimony. *Dunahoo v. Apfel,* 241 F.3d 1033, 1038 (8th Cir. 2001) (stating that if an ALJ provides a "good reason" for discrediting claimant's credibility, deference is given to the ALJ's opinion, "even if every factor is not discussed in depth."). Moreover, if the ALJ finds that the claimant has not been compliant with prescribed medical treatment, the ALJ is justified in disregarding the claimant's subjective testimony regarding his or her disability. *See Holley v. Massanari*, 253 F.3d 1088, 1092 (8th Cir. 2001) (holding that an ALJ may consider noncompliance with medical treatment in his decision to dispense with claimant's subjective complaints); *Guziewicz v. Barnhart*, 114 Fed. Appx. 267, 269 (8th Cir. 2004) (holding that where claimant "had been noncompliant with prescribed medical treatment, including advice to quit smoking," ALJ was justified in determining that claimant's subjective statements were not credible).

In her decision, the ALJ discussed several incidents of Pluth's noncompliance with medical treatment that justify the ALJ's credibility determination with respect to Pluth's testimony. Specifically, the ALJ cited evidence in the record of Pluth's noncompliance with the use of her back brace following her second surgery (Tr. 46); inconsistent physical therapy attendance; and cancellation of a followup appointment with her surgeon (Tr. 48). The ALJ emphasized Pluth's inability to refrain from smoking as recommended by her

13

physicians, both prior to and following her surgeries.  (Tr. 44).  The ALJ noted that Pluth acknowledged at her hearing that her continued smoking after her surgery had affected her healing.  (Tr. 44, 650).   Pluth's failure to be smoke-free also damaged her credibility with the ALJ.  The ALJ noted that she "[found] it troublesome that Ms. Pluth was unable to stop smoking for such a long period of time so that the surgery could be accomplished, if in fact, her pain was at the level she has described."  (Tr. 45).

The ALJ also noted inconsistencies in Pluth's reported symptoms and other evidence in the record.  Specifically, the ALJ noted that no evidence from either treating physician supported Pluth's report that her pain caused her to spend twelve hours each day lying down.  (Tr. 48).  The ALJ further noted that in the medical records from Pluth's July 23, 2008, visit, "Dr. McClellan stated that [Pluth] should be off narcotics at this point, suggesting that her complaints of debilitating pain were not founded."  (Tr. 49).[6]

Finally, the ALJ questioned Pluth's motivation to work based on her application for SSI benefits prior to her first surgery and the fact that she didn't work even in years she was not alleging disability. (Tr. 47).  *See Fredrickson v. Barnhart*, 359 F.3d 972, 976 (8th Cir. 2004) (holding that claimant's sporadic work record, relatively low earnings, and years with no reported earnings indicated a "potential lack of motivation to return to work").

---

[6]The Court notes additional inconsistencies between Pluth's testimony and the evidence in the record.  For example, Pluth testified that she doesn't exercise on her own because she doesn't know her limits and doesn't want to make her condition any worse (Tr. 661), but one of the components of her physical therapy was the development of a home exercise program.  (Tr. 380).  Pluth also testified that she was up and down all night, but reported to her physical therapist that she does not wake through the night.  (Tr. 658, 380).

14

The Court finds that the ALJ articulated "good reason" for discrediting Pluth's testimony and subjective report of symptoms.

### Weight of Medical Evidence

Pluth contends that the ALJ improperly weighed the medical evidence in the record, giving preference to the opinions of her surgeon, Dr. McClellan, and largely dismissing those of her primary care physician, Dr. Wenzl. Both doctors treated Pluth on numerous occasions and may be considered treating physicians.

"The opinion of a treating physician is accorded special deference under the social security regulations." *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000). Thus, "[a] treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight." *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000). "If a treating physician's opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, the opinion should be given controlling weight." *Krogmeier v. Barnhart,* 294 F.3d 1019, 1023 (8th Cir. 2002).

However, "[a]lthough a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Pirtle v. Astrue*, 479 F.3d 931, 933 (8th Cir. 2007) (quoting *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001)). Thus, an ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered an inconsistent or contrary opinion. *Leckenby v. Astrue*, 487 F.3d 626, 633 (8th Cir. 2007); *Holmstrom v. Massanari,* 270 F.3d 715, 720 (8th Cir. 2001); *Sampson v. Apfel*, 165 F.3d

15

616, 618 (8th Cir. 1999). "The ALJ's function is to resolve conflicts among 'the various treating and examining physicians.'" *Estes v. Barnhart,* 275 F.3d 722, 725 (8th Cir. 2002) (quoting *Bentley v. Shalala,* 52 F.3d 784, 785, 787 (8th Cir. 1985)). Whether the ALJ grants controlling weight to the treating physician or not, the ALJ must "always give good reasons" for that weighting. *Holmstrom,* 270 F.3d at 720*; Prosch,* 201 F.3d at 1013 (quoting 20 C.F.R. §§ 404.1527(d)(2), 416.927).

<u>Dr. Wenzl</u>

Although, as her primary care physician, Dr. Wenzl treated Pluth throughout the period of alleged disability, the ALJ did not give great or controlling weight to his opinions. (Tr. 44-47).

Prior to Pluth's first surgery, in a note dated August 29, 2005, Dr. Wenzl opined that Pluth was totally disabled, for an indeterminate length of time and scheduled for surgery on September 1, 2005. (Tr. 631). Then in a letter dated April 24, 2007, Dr. Wenzl opined that Pluth was totally disabled and unable to seek employment. (Tr. 630). He stated further that she would have to proceed with surgery before she would be able to seek employment more actively, but was currently unable to undergo surgery for unexplained reasons. (Tr. 630). The ALJ takes issue with these opinions expressed by Dr. Wenzl.

"[S]tatements that a claimant could not be gainfully employed 'are not medical opinions but opinions on the application of the statute, a task assigned solely to the discretion of the Secretary.'" *Cruze v. Chater*, 85 F.3d 1320, 1324 -1325 (8th Cir. 1996) (quoting *Nelson v. Sullivan*, 946 F.2d 1314, 1316 (8th Cir.1991)). Thus, Dr. Wenzl's opinions regarding Pluth's inability to work are not medical opinions, but statements regarding the application of the statute. As a result, the ALJ need not attribute controlling

16

weight to his statements regarding the application of the statute; instead, the Eighth Circuit Court of Appeals has held that to be a "task assigned solely to the discretion of the Secretary." *Id.*

Moreover, the ALJ demonstrated that Dr. Wenzl's medical opinions were inconsistent with, or unsupported by, substantial evidence in the record as a whole. The ALJ noted that the medical questionnaire completed by Dr. Wenzl on June 27, 2008, was a "vague checklist" without any accompanying explanation for his opinions regarding Pluth's physical limitations. (Tr. 47, 628-629)

Dr. McClellan

_____The ALJ gave greatest weight to the opinion of Dr. McClellan, Pluth's orthopedic specialist and surgeon. (Tr. 47-49). The ALJ did so based on Dr. McClellan's status as a specialist and his treating relationship with Pluth that spanned several years. (Tr. 47, 49). The ALJ noted that Dr. McClellan did not endorse the employment restrictions identified by Dr. Wenzl. (Tr. 47).

The Court finds that the ALJ gave "good reasons" for her decision to give Dr. McClellan's opinion more weight than that of Dr. Wenzl, in view of the record as a whole.

***Residual Functional Capacity ("RFC")***

Pluth argues that the ALJ's determination of her RFC is unsupported by substantial evidence. Specifically, Pluth contends that the ALJ's findings are inconsistent with her reported daily activities and the medical opinion of Dr. Wenzl. (Filing No. 17, p. 21).

"'Residual functional capacity' is defined as the most an individual can still do despite the 'physical and mental limitations that affect what [the individual] can do in a work setting' and is assessed based on all medically determinable impairments, including those

17

not found to be 'severe.'" *Baker v. Barnhart*, 457 F.3d 882, 889 n. 3 (8th Cir. 2006) (quoting 20 C.F.R. § 404.1545(a)(1) & (2)).  An ALJ determines a claimant's RFC based on "'all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009).

In the present case, and as stated above, the ALJ fully and properly evaluated the evidence in the record before determining Pluth's RFC.  While Pluth may be able to point to evidence that could support a finding of disability, this Court "may not reverse [the ALJ's decision] because substantial evidence exists in the record that would have supported a contrary outcome." *McKinney*, 228 F.3d at 863.  That is, Pluth's RFC, as determined by the ALJ, is the product of the ALJ's responsibility to weigh and reconcile potentially conflicting evidence in the record, *see* 20 C.F.R. § 416.927(c)(2), and the dutiful fulfillment of that role is not to be overturned or superseded by the Court. S*ee id.*  As discussed in detail above, sufficient evidence supports the ALJ's findings.  Therefore, the Court finds that, having properly considered the evidence in the record, the ALJ appropriately determined Pluth's RFC.

### *Hypothetical*

Pluth argues that the crucial hypothetical posed to the VE was inaccurate because it was based on the ALJ's flawed determination of Pluth's RFC, credibility, and weighing of medical evidence and opinion as discussed in previous sections of this memorandum. Pluth further noted that the hypothetical posed to the VE did not reflect the findings of the

18

work evaluation that was completed after the ALJ's decision and submitted to the Appeals Council.

In posing a hypothetical question to a VE, an ALJ must include all impairments "supported by substantial evidence in the record as a whole." *Grissom v. Barnhart*, 416 F.3d 834, 837 (8th Cir. 2005).  In this case, the ALJ's hypotheticals met this requirement. The Court has carefully reviewed the hypothetical questions posed to the VE and the Court finds that they included those impairments found credible by the ALJ.  This Court has already found that the ALJ's determinations are supported by substantial evidence.  The Court finds the ALJ's questions posed to the VE are supported by substantial evidence on the record.

### Additional Evidence Submitted to Appeals Panel

Pluth further argues that while she timely submitted "new and material evidence" to the Appeals Council, there is no indication that the Appeals Council considered that evidence before denying her request for review.  (Filing No. 17 at 12-13).  Pluth argues that the Appeals Council's failure to "specify whether or not the last submissions were considered, whether they were deems to be 'new' or 'material', what weight was given to the materials or whether the [ALJ's] findings were contrary to the weight of the evidence as augmented" requires that this Court reverse the Commission's decision and remand the matter.  (Id. at 13-14)

The additional evidence submitted by Pluth to the Appeals Council includes a work evaluation (Tr. 25-28) and three statements written by Pluth in support of her appeal (Tr. 29-31).  The work evaluation was completed by Colleen Wessel at WESCO Industries on February 4, 2009.  Wessel notes that "in all of Ms. Pluth's timed studies, all of her

19

capabilities were in the 'far below standards' category for competitive work standards." (Tr. 28) She concluded that Pluth's limitations would make it very difficult for her to obtain and maintain competitive employment" (Tr. 28)  Pluth's written statements consist of brief explanations of her inability to stop smoking, her inability to comply with the requirements of the Employment First program, and a description of the incident characterized by the ALJ as Pluth "jumping off a wall" that resulted in a visit to the emergency room.  (Tr. 29-31).

In accordance with the decisions of the Eighth Circuit, this Court will consider the additional evidence as part of the administrative record.  See *Gartman v. Apfel*, 220 F.3d 918, 922 (8th Cir. 2000).  The Court disagrees with Pluth's contention that the lack of reference to the additional evidence requires the Court to reverse and remand.  In *Gartman*, the Eighth Circuit found that the physician's revised opinion, submitted to the Appeals Council after the ALJ's decision, "might well persuade the ALJ that [claimant] could not return to work at [her former employment]." *Id.*  However, the Court does not find Pluth's additional evidence to be equally compelling.

The Court has reviewed the additional evidence submitted to the Appeals Council and concludes that the ALJ's decision remains fully supported by the substantial evidence on the record.  This new evidence does not warrant reversal of the ALJ's decision.

## CONCLUSION

For the reasons discussed, the Court concludes that the Commissioner's decision denying benefits is supported by substantial evidence on the record as a whole and is affirmed.

20

IT IS ORDERED that the decision of the Commissioner is affirmed, the appeal is denied, and a separate Judgment in favor of the Defendant will be entered.

DATED this 4th day of June, 2010.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge